**THOMAS P. SMITH, JR.**
**ACTING REGIONAL DIRECTOR**
Sheldon L. Pollock
Sandeep Satwalekar
Brian A. Kudon
Nicholas Karasimas
Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0086 (Karasimas)
karasimasn@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>         Plaintiff,<br><br>  -against-<br><br>FRANK OKUNAK,<br><br>         Defendant. | <u>COMPLAINT</u><br><br>22 Civ. 6389<br><br>JURY TRIAL DEMANDED |

    Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Frank Okunak ("Okunak" or "Defendant"), alleges as follows:

<u>**SUMMARY**</u>

    1.  This action involves Okunak's falsification of the books and records of a publicly traded global advertising and marketing company (the "Issuer"), and Okunak's circumvention of the Issuer's internal accounting controls, from approximately 2011 through approximately July 2020 (the "Relevant Period"). Throughout the Relevant Period, Okunak was an executive of a subsidiary of the Issuer (the "Subsidiary").

2.    Throughout the Relevant Period, Okunak directed the creation of, and in some cases approved for processing and payment, falsified purchase orders and invoices. The false purchase orders and invoices purported to be for services being performed for the Issuer but instead, Okunak misappropriated funds for his benefit. The misappropriated funds were paid to entities in which Okunak had an interest, to entities performing services for entities in which he had an interest, and to pay Okunak's personal expenses.

3.    Okunak also circumvented the Issuer's internal controls to aid in his misappropriation. He routinely submitted false certifications failing to disclose, among other things, his conflicts of interest and his knowledge of any improper payments, and circumvented controls related to the onboarding and payment of the Issuer's vendors.

4.    Okunak's falsification of books and records and circumvention of internal accounting controls allowed him to misappropriate more than $16 million from the Issuer during the Relevant Period.

## VIOLATIONS

5.    By virtue of the foregoing conduct and as alleged further herein, Okunak aided and abetted violations of Section 13(b)(2)(A) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78m(b)(2)(A)], and violated Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

6.    Unless Okunak is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.    The Commission brings this action pursuant to the authority conferred upon it by

Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

8. The Commission seeks a judgment: (a) permanently enjoining Okunak from aiding and abetting violations of, or violating, the federal securities laws and rules this Complaint alleges he has violated; (b) permanently enjoining Okunak from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to the Court's authority under Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; (c) that leaves for the Court to determine, upon motion of the Commission, whether it is appropriate to order disgorgement of ill-gotten gains, and if so, in what amount, and if disgorgement is ordered, with Okunak to pay prejudgment interest thereon; (d) that leaves for the Court to determine, upon motion of the Commission, whether to order Okunak to pay a civil monetary penalty pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and if so, in what amount; and (e) ordering any other further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

10. Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

11. Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa]. Both the Issuer and Subsidiary maintain a principal place of business in New York, New York, and Okunak was employed at the New York, New York location at all relevant times. Okunak

committed the acts that constitute the alleged violations in this District.

## DEFENDANT

12.     **Okunak**, age 56, is a resident of Lyndhurst, New Jersey.  Okunak was the Global Chief Financial Officer ("CFO") of the Subsidiary from 2009 through 2019, and its Chief Operating Officer from 2013 until he was terminated in July 2020.

## OTHER RELEVANT ENTITIES

13.     The **Issuer** is a Delaware corporation with its principal place of business in New York, New York.  The Issuer is a global advertising and marketing company with more than 50,000 employees.  The Issuer is a publicly traded company, listed on the New York Stock Exchange.

14.     The **Subsidiary** is a subsidiary of the Issuer headquartered New York, New York. The Subsidiary is a public relations firm with more than 4,000 employees.

## FACTS

**I.     BACKGROUND**

15.      Okunak began working at the Subsidiary in 1995 as a financial manager, left the Subsidiary in 1999, and returned to the Subsidiary as its North American CFO in 2001.  He was promoted to Global CFO of the Subsidiary in 2009, and promoted to Global CFO and COO in 2013.  He served as Global CFO until 2019 and as COO until his termination in July 2020.

16.     During the Relevant Period, Okunak became involved with, and held financial interests in, a number of entities outside of his employment at the Subsidiary.  Okunak arranged for certain of these entities to become vendors of the Issuer, and directed millions of dollars in payments from the Issuer to these entities, for services not actually provided to the Issuer.  In other instances, Okunak directed payments to companies that were performing services for

entities he had an interest in, rather than the Issuer. Finally, Okunak directed the Issuer to make payments for his personal expenses. Okunak was able to direct these payments in this manner by falsifying the Issuer's books and records, and subverting its internal accounting controls, as discussed below.

17. In total, Okunak misappropriated more than $16 million from the Issuer during the Relevant Period. Of that amount, Okunak misappropriated approximately $11.5 million during the period covered by the relevant statute of limitations, as modified by tolling agreements executed by Okunak and the Commission (the "Tolling Agreements").

## II. OKUNAK'S FALSIFICATION OF THE ISSUER'S BOOKS AND RECORDS

18. Throughout the Relevant Period, Okunak directed the Issuer to make payments to entities for services that did not relate to work performed for the Issuer or the Subsidiary, pursuant to invoices and purchase orders. These invoices and purchaser orders were false because they did not actually relate to services provided to the Issuer or the Subsidiary. Instead, they facilitated payment for services and expenses related to Okunak, and entities with which he was connected.

19. Typically, Okunak directed the creation of a purchase order by emailing instructions containing the entity, the amount, and the description of the services being performed to a Senior Business Analyst ("Employee A") who reported directly to him.[1] Invoices were prepared by the party being paid, which in some cases was owned or controlled by Okunak, and again referenced services that were not performed for the Issuer or the Subsidiary.

20. In total and including the specific instances discussed below, Okunak

---

[1] Employee A worked extensively with Okunak, and performed a number of administrative tasks for Okunak and other executives of the Subsidiary. With respect to the conduct alleged herein, Employee A performed purely administrative tasks, at Okunak's direction.

misappropriated approximately $16 million during the Relevant Period.

21.     For example, Okunak directed the Issuer, based on falsified purchase orders and invoices, to make payments totaling $2.5 million to an e-sports and entertainment event company that he owned and controlled ("Company A").  Company A, however, did not provide the services or perform any work for the Issuer or the Subsidiary as set forth on the purchase orders or invoices.  Rather, Okunak was directing payments from the Issuer to Company A to fund Company A's operating expenses.

22.     In some instances, Okunak took specific steps to alter vendor invoices to make it appear as though the services being provided were related to the Issuer, obscure the true nature of the payment, or otherwise create a level of generality that would prevent closer scrutiny.

23.     For example, in November 2018, Okunak received an invoice for approximately $77,000 from an entity ("Company B") that had performed services for a company he had an interest in ("Company C").  These services provided by Company B to Company C were not for the benefit of the Issuer or Subsidiary.  The invoice from Company B specifically referenced Company C, for whom the work was performed.  But before submitting the invoice for internal processing, Okunak deleted the reference to Company C, and inserted a generic description that would be less likely to draw scrutiny.  On multiple occasions, Okunak requested that invoices be provided in a format that would permit his further editing.

24.     Okunak also falsified purchase orders and invoices to facilitate payment for certain personal expenses.  For example, in June 2017, a large sports complex operator reached out to Okunak concerning his outstanding suite license fee of approximately $90,000.  This was a personal expense, unrelated to the Issuer or the Subsidiary.  Nonetheless, Okunak directed Employee A to prepare a purchase order for the same amount, to be paid to the sports complex

operator, and provided a false description for the purchase order. Okunak then approved the invoice for payment to the sports complex in the same amount.

25. As a result of Okunak's conduct, the Issuer maintained books and records that did not fairly and accurately reflect the nature of the transactions to which they related, or accurately reflect the nature of the disposition of the Issuer's assets.

### III. OKUNAK'S CIRCUMVENTION OF THE ISSUER'S INTERNAL ACCOUNTING CONTROLS

26. During the Relevant Period, Okunak circumvented the Issuer's internal accounting controls in multiple ways, including by executing false certifications concerning his conflicts of interest and knowledge of misconduct, and manipulating the Issuer's process for vendor procurement and payment by providing false information with respect to the expenses he caused the Issuer to incur.

#### A. Falsification of Certifications

27. As part of its internal control framework, the Issuer required its officers and directors, including those at subsidiary companies such as the Subsidiary, to disclose any interests in the Issuer's or its subsidiaries' vendors. As part of this process, the Issuer required Okunak to complete a yearly "Disclosure & Certification" form.

28. The Disclosure and Certification form provided the opportunity to disclose any conflicts of interest and contained a series of "yes" or "no" questions related to potential conflicts with vendors or clients. For example, the Disclosure and Certification form asked whether the employee had a substantial financial or ownership interest in any organization (including vendors) that has been in a business relationship with the Issuer or its subsidiaries, if the employee was in a position to award business or otherwise influence the Issuer's business with such organizations. Okunak falsely responded "no" to these questions and did not disclose

any conflicts.

29. Okunak also acknowledged on the Disclosure and Certification form that he had the opportunity to review the Issuer's Code of Conduct, and understood that he must seek advice and counsel from the Issuer's human resource, legal, or risk functions before taking actions that, based on the Code of Conduct and other policy documents, would raise a question of impropriety or the appearance of impropriety.

30. In addition, the Issuer relied on a certification and sub-certification process to gather information, which formed the basis of representations made to the Issuer's auditor by senior management.

31. As part of this process, in addition to certifying conformity with GAAP and certifying as to the accuracy of the financial statements, Okunak regularly falsely confirmed to the Issuer, among other things:

    (i) that he had no knowledge of any employee being involved in the making of any payments for which no goods or services were provided, unusual billing practices, or completing transactions that were not fully and accurately reported in the company's books and records;

    (ii) that there were no undisclosed side agreements;

    (iii) that he had no knowledge of fraud or suspected fraud, by Senior Management, Management or other employees with significant responsibility in internal controls over financial reporting; and

    (iv) that he was not aware of payments which were deliberately disguised in the accounting records or attempts to conceal transactions or payment made by or on behalf of the Issuer or one of its affiliates.

32. Okunak's responses, representations, and certifications on the above-mentioned documents were knowingly false. Okunak knew that he had a significant interest in entities he was causing the Issuer to pay. Okunak knew that he had utilized falsified vendor invoices and purchase orders to conceal transactions. And Okunak knew that he was misappropriating the Issuer's funds for his own benefit.

**B.       Circumvention of the Vendor Onboarding and Payment Processes**

33. During the Relevant Period, Okunak also circumvented internal controls in the vendor onboarding process by submitting false information on the Issuer's vendor onboarding form with respect to Company A, and circumvented the process by which expenses were approved for payment by providing false and misleading information to other employees at the Issuer, who relied on that information when processing payments.

34. A number of vendors or entities to which Okunak directed payments were "new" vendors that did not previously exist within the Issuer's database, and as a result needed to be onboarded to ensure payment.

35. At the onboarding stage, Okunak circumvented internal controls by directing certain vendors to be onboarded without disclosing his interest in that vendor, which would have triggered additional scrutiny.

36. With respect to Company A, Okunak submitted false and misleading information on a vendor information form required by the Issuer. Specifically, Okunak listed a relative (who has a different surname) as the owner and CEO of Company A. Despite incorporating Company A using his relative's name, Okunak owned and controlled Company A at all relevant times. On the vendor information form, there is no indication that the relative is connected with Okunak, and no indication that Okunak is connected with Company A. And, as described above, Okunak

never otherwise disclosed his interest in Company A on any form that would have required it.

37. During the Relevant Period, to remit a payment to a vendor, the Issuer required an approved purchase order, or in some instances, an approved non-purchase order invoice. The preparation and approval of purchase orders and invoices for payment was subject to certain controls. Approval typically involved Issuer employees at multiple levels of authority, and the person that submitted or created the purchase order could not be the same person that provided an approval. These controls necessarily rely on the persons involved furnishing accurate information. Okunak circumvented the controls around the submission and approval of invoices and purchase orders by providing false information concerning the purpose and nature of the relevant expenses.

38. Okunak directed Employee A to create all or nearly all of the purchase orders at issue. Okunak sent email instructions to Employee A regarding purchase orders to be generated, and by doing so, falsely suggested that the purchase orders were related to the Issuer's business or for the Issuer's benefit. Okunak never indicated to Employee A or anyone at the Issuer that these purchase orders were not, in fact, related to the Issuer's business or otherwise for the Issuer's benefit.

39. Similarly, Okunak circumvented and interfered with the process by which purchase orders or invoices were approved. In some instances, Okunak provided a level of approval for an invoice or purchase order, and in these cases, did so knowing that the payments were improper and not for the benefit of the Issuer. In other instances, he provided approvers (or directed Employee A to provide approvers) with false and misleading information regarding the nature of the expenses. For example, in a number of instances, Okunak instructed Employee A to include a description in the purchase order that seemed plausibly related to the Subsidiary's

business.  As a result, approvers relied on false and misleading information ultimately provided by Okunak regarding the nature of the expenses.  Okunak was well-positioned to circumvent controls in this manner given his status as a high-ranking, long-tenured executive of the Subsidiary.

40. Through the conduct described above, Okunak knowingly circumvented the Issuer's system of internal accounting controls.

## **TOLLING AGREEMENTS**

41. On December 8, 2021, March 2, 2022, May 16, 2022, and July 6, 2022, Okunak entered into Tolling Agreements with the Commission.  The Tolling Agreements specify a period of time (a "tolling period") in which the "running of any statute of limitations applicable to any action or proceeding against Okunak authorized, instituted, or brought by . . . the Commission . . . arising out of the [Commission's investigation], including any sanctions or relief that may be imposed therein, is tolled and suspended for the period beginning on December 7, 2021 through August 6, 2022 . . . ."  The Tolling Agreements further provide that Okunak and any of his agents or attorneys "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defense."

## **FIRST CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(A)**

42. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 41.

43. At all relevant times, Exchange Act Section 13(b)(2)(A) [15 U.S.C. §

78m(b)(2)(A)] required the Issuer, as an issuer whose securities were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of the issuer.

44. By engaging in the acts and conduct alleged herein, Okunak, directly or indirectly, singly or in concert with others, aided and abetted the Issuer in failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of the issuer, in violation of Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

45. Among other things, Okunak aided and abetted this violation by knowingly directing the creation and submission of false purchase orders and invoices.

46. By reason of the foregoing, Okunak has aided and abetted and, unless enjoined, will continue to aid and abet violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## SECOND CLAIM FOR RELIEF
**Violations of Exchange Act Section 13(b)(5)**

47. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 41.

48. At all relevant times, Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] made it unlawful for any person to knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any books, records, or accounts that are described in Exchange Act Section 13(b)(2) [15 U.S.C. § 78m(b)(2)].

49. By engaging in the acts and conduct alleged herein, Okunak knowingly circumvented a system of internal accounting controls and knowingly falsified books, records, or

accounts described in Exchange Act Section 13(b)(2)[15 U.S.C. § 78m(b)(2)], in violation of Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)].

50. Among other things, Okunak committed this violation by knowingly directing the creation and submission of false purchase orders and invoices, and by knowingly circumventing internal accounting controls by submitting false certifications and otherwise evading controls concerning the vendor onboarding and payment process.

51. By reason of the foregoing, Okunak violated, and unless enjoined will continue to violate Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)].

### THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Rule 13b2-1

52. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 41.

53. At all relevant times, Exchange Act Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1] made it unlawful for any person to directly or indirectly falsify or cause to be falsified any book, record, or account subject to Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

54. By engaging in the acts and conduct alleged herein Okunak, directly or indirectly, falsified or caused to be falsified books, records, and accounts subject to Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)], in violation of Exchange Act Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1].

55. Among other things, Okunak committed this violation by directly or indirectly falsifying or causing to be falsified purchase orders and invoices.

56. By reason of the foregoing, Okunak violated, and unless enjoined will continue to violate, Exchange Act Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Judgment:

**I.**

Permanently enjoining Okunak from aiding and abetting violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], and from violating Sections 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §§ 240.13b2-1].

**II.**

Permanently enjoining Okunak from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to the Court's authority under Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

**III.**

Ordering Okunak, if the Court deems it appropriate upon motion of the Commission, to disgorge all ill-gotten gains he received directly or indirectly, with prejudgment interest thereon, and if so, with the amount to be determined by the Court upon motion by the Commission;

**IV.**

Ordering Okunak, if the Court deems it appropriate upon motion of the Commission, to pay civil monetary penalties under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and if so, with the amount to be determined by the Court upon motion of the Commission; and

**V.**

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
July 27, 2022

/s/ Thomas P. Smith, Jr.
_____
THOMAS P. SMITH, JR.
ACTING REGIONAL DIRECTOR
Sheldon L. Pollock
Sandeep Satwalekar
Brian A. Kudon
Nicholas Karasimas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0086 (Karasimas)
karasimasn@sec.gov